(No. 37797.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, *vs.* CAROL KELLEY, Appellant.

*Opinion filed September 27, 1963.*

Prentice H. Marshall, of Chicago, for appellant.

William G. Clark, Attorney General, of Springfield, and Daniel P. Ward, State's Attorney, of Chicago, (Fred G. Leach and E. Michael O'Brien, Assistant Attorneys General, and Elmer C. Kissane and James R. Thompson, Assistant State's Attorneys, of counsel,) for the People.

Mr. Chief Justice Klingbiel delivered the opinion of the court:

Defendant, Carol Kelley, was tried by jury in the criminal court of Cook County and found guilty of the crime of murder, for which she was sentenced to the Illinois State Reformatory for Women for a term of not less than 14 nor more than 25 years. The defendant has appealed to review the judgment of conviction.

The defendant's principal contention is that the evidence was insufficient to establish her guilt beyond a reasonable doubt and a careful analysis of the evidence is therefore required. Thomas Pawlak testified that on Sunday, May 6, 1962, at approximately 11:30 A.M., he was driving south on Wolf Road in Cook County. He was driving in the right hand lane at a speed of about 30 miles an hour when he observed a car in the left lane, also proceeding southward at a speed of about 15 miles per hour. A man, later identified as Dr. Frank Reed, the deceased, was driving the car and a woman, later identified as the defendant, was seated in the right front seat. Pawlak noticed the car moving into the right lane and he sounded his horn. The other car continued to move into the right lane and the defendant turned and looked back at Pawlak, who

pulled into the left lane and passed the other car. As he passed he noticed that Dr. Reed appeared pale and was slumped low in his seat. The defendant was facing Pawlak as he passed. Pawlak proceeded south and stopped at a stoplight. He looked around and noticed that as the other car approached the Hillside Police Station it began to angle toward the right curb. Dr. Reed was at that time facing the defendant. The car then went over the curb, crashed through a fence around a school yard, stopped momentarily, then proceeded in a southerly direction until it hit the south boundary fence of the school yard where it hit a fire plug and came to a halt. The car then backed up and proceeded at high speed in reverse in a northerly direction through a number of bushes, knocked over a flag pole, crashed through the fence at the north boundary of the school yard, and came to a halt when it hit a squad car parked near the police station. On cross examination, Pawlak testified that as he passed the other car the defendant appeared to be talking to the driver "in an animated fashion". However, he could not say that she was arguing with the driver and did not notice her make any gestures with her hands. He did not hear any shot from the other car.

Paul Rinaldi, a police officer of the village of Hillside, testified that he first saw Dr. Reed's car when it was going in reverse through the school yard. After the car hit the squad car, Rinali and his partner, Sgt. Golz, approached the car and noticed that Dr. Reed was slumped over the wheel and appeared very pale. The defendant was seated alongside him in the front seat. Rinaldi testified that he saw the defendant placing something underneath the front seat but defense counsel objected to this statement and the objection was sustained and the statement of the witness was stricken. The defendant opened the door and Rinaldi told Sgt. Golz to grab her and hold her because the man had been shot. He was asked how he knew that the driver had been shot and he testified, over objection, that he asked

the driver what was wrong and he said, "She shot me." The witness testified that after the defendant got out of the car he searched the car and found a .22 caliber automatic under the front seat on the passenger side. On cross-examination the witness testified that when he first saw the defendant she was bending forward but he did not know whether she was trying to hide a gun or not.

Sgt. Golz testified that the first time he saw the defendant she was coming into the police station. He testified as to the search of the car and the recovery of the gun and also testified that he examined the gun and found 8 loaded cartridges in the magazine. He manually ejected one empty shell from the chamber. According to the witness, the gun should have automatically ejected the empty shell after it had been fired. Sgt. Golz then questioned the defendant briefly, without taking notes of the conversation. About two hours later, he questioned her again, this time writing down the questions and answers. The defendant was then taken to the Maywood police station because Hillside had no facilities for keeping prisoners. When she was brought back to Hillside the following day, the defendant refused to sign the statement. The witness went on to testify that he and another officer examined the contents of the defendant's purse immediately after she had been brought into the station after the collision with the squad car. Among the items found in the purse was a loaded .22 caliber bullet and some letters.

Following the cross-examination of Sgt. Golz the defendant's statement was read to the jury. In that statement the defendant said that early Sunday morning Dr. Reed telephoned her and said that he wanted to see her. She told him that she did not want to see him and hung up the phone. About 10 minutes later Dr. Reed called back and begged her to meet him somewhere. She agreed to meet him because she wanted to return his letters to him. She didn't want Dr. Reed to come to her house because

several months earlier she and the doctor had had a quarrel and he beat her to such an extent that she had to go to the hospital for treatment. She agreed to meet Dr. Reed in the Hillside Shopping Center and he was there in his car when she arrived. She parked her car, got into the doctor's car and told him that she didn't want to see him anymore because he was a married man with three children and because he had beaten her up previously. They then left the shopping center in the doctor's car and she asked him to stop and let her out. She tried to get out of the car as they approached the police station and a struggle ensued, during which the doctor struck her. They were driving in the lane closest to the center of the road and the car started to move diagonally across the road to the right. She then heard a horn blow behind them and Dr. Reed turned around to look and the gun went off. She said that she had first seen the gun after she got into the car. Dr. Reed had the gun in his right hand as it was resting on the seat of the car. She went on to say that as they were struggling in the car, the doctor turned toward her. She lost sight of the gun and thought that while they were struggling the gun went off. She said that she felt a little "kick" when the gun discharged. She stated that she remembered going through the fence off the road and thought that the gun went off just before the car left the street. She said that she had the gun in her hand when the car stopped and that she dropped it on the floor. She said that she had bought the gun for Dr. Reed as a Christmas present. She said that she was not sure how the loaded bullet got into her purse but that she had bought some bullets with the gun and one of the bullets might have fallen into her purse then. She also said that sometimes when her ex-husband visited her boys he gave them bullets because he had a lot of guns, and she thought that she might have taken a bullet from one of the boys and put it in her purse. She hadn't used the purse in a long time.

She was asked whether she had any intention of causing Dr. Reed any bodily harm when she left her home in the morning, and she said she had not, and that she thought she could appeal to him to end the affair for the sake of his family.

On redirect examination, Sgt. Golz testified that in the course of his investigation he went to Hillside Shopping Center and found the defendant's car parked there. He testified that he did not observe any bruises on the defendant's face or hands.

An expert witness from the Chicago Crime Laboratory testified that he found a bullet hole in Dr. Reed's coat but found no powder burns. He further testified that he would not expect to find any powder burns if the gun were 8 or 10 inches away from the coat at the time it was fired.

A doctor testified that he first saw Dr. Reed on the day of the shooting when he was brought into the emergency room at the hospital. He testified that he found a bullet wound in Dr. Reed's abdomen with the point of entry on the right side. In the doctor's opinion the deceased died of complications resulting from that bullet wound.

Dr. Reed's widow testified that she had never seen the .22 caliber automatic in Dr. Reed's possession. She testified that there were occasions when the doctor did carry a gun in his car but that on those occasions he used a .38 caliber gun.

The above evidence, which we have stated in considerable detail, was the only evidence offered by the State and the defense rested without offering any evidence. We are therefore called upon to decide whether the State's evidence, uncontradicted by any evidence on behalf of the defendant, was sufficient to establish the defendant's guilt beyond a reasonable doubt.

Where the evidence in a criminal case is heard by a jury, this court will not disturb a verdict of guilty unless the

evidence is so palpably contrary to the verdict or so unreasonable, improbable, and unsatisfactory as to justify this court in entertaining reasonable doubt as to the defendant's guilt. (*People* v. *Sustak,* 15 Ill.2d 115, 123.) The jury is not required to disregard the inferences that flow normally from the evidence before it, (*People* v. *Brown,* 27 Ill.2d 23, 26,) and neither the jury nor this court is required to conjure up hypotheses from the evidence that are inconsistent with the defendant's guilt, and elevate these potential explanations to the status of a reasonable doubt. (*People* v. *Russell,* 17 Ill.2d 328, 331.) Where the evidence is in part circumstantial a conclusion that the defendant is guilty beyond a reasonable doubt need not follow necessarily from the proven circumstances, but may be obtained therefrom by probable deduction. (*Gannon* v. *People,* 127 Ill. 507.) The jury was not obligated to believe the defendant's statement that she shot the deceased accidentally, and it could reasonably have inferred from the presence of the bullet in the defendant's purse, from the deceased's statement that "She shot me," and from the other evidence, that the defendant intentionally shot and killed the deceased. It is undisputed that the deceased lost his life by a shot fired from a gun in the defendant's hand, since the defendant admitted in her statement that she felt the gun "kick" in her hand. The burden was on the defendant to prove circumstances mitigating, justifying, or excusing her act, unless it was manifest from the proof on the part of the prosecution that the killing was justified, and it was the province of the jury to determine whether the circumstances proved were sufficient. (*People* v. *Franklin,* 390 Ill. 108.) We are of the opinion that there was sufficient evidence to support the jury's verdict.

We turn now to a consideration of the other errors assigned. The defendant contends that she did not receive a fair trial, due to the conduct of the trial judge. The record

is replete with evidence sustaining the defendant's contention. When the prosecutor was inquiring as to the search of the defendant's purse, counsel objected to certain questions and the court told him to sit down or he would have the bailiff sit him down. The court later asked defendant's counsel if he had any point in bringing out the personal effects of the defendant's purse and told counsel that this was a murder case, and not a trial of the contents of the defendant's purse. Shortly thereafter, following a statement by defense counsel, the court told him not to do that because the court had high blood pressure and it wasn't good for his health to get excited. The court accused defense counsel of stalling around and told him to "get informed". The judge twice pounded his gavel with such force that it broke. On several other occasions the court attempted to be humorous in his remarks. At the close of the State's case the defendant's counsel stated that he was not prepared to go ahead with the defense and the court told him that he didn't try enough cases in the criminal court, and that in his court they went right through the cases, put in everything and left it up to the jury. These examples of the judge's conduct are sufficient to demonstrate that his attitude toward defense counsel was one of impatience and hostility. The remarks and conduct of the court in the presence of the jury were apt to influence them in arriving at their verdict. In our opinion the defendant did not receive a fair trial and the judgment of conviction must be reversed and the cause remanded for a new trial.

We shall briefly consider two other contentions advanced by the defendant. She contends that the testimony of the police officer that the deceased said "She shot me" was inadmissible. In our opinion the deceased's statement was admissible as a spontaneous declaration (*People* v. *Poland, 22* Ill.2d 175.) It might also be considered by the jury as an implied admission by the defendant by reason of her failure to reply, if the jury believed that she heard the

statement, that it was made under circumstances which would normally provoke a denial, and that she voluntarily remained silent.

Finally the defendant contends that the prosecutor improperly commented in his final argument on the defendant's failure to testify. The remark in question could be construed as commenting upon the defendant's failure to reply to the deceased's statement, or could be construed as a comment upon the defendant's failure to testify at the trial. In a new trial of this cause, if the defendant does not testify in her own behalf, the prosecutor should refrain from making any argument that could be construed by the jury as a comment on her failure to testify.

The judgment of the criminal court of Cook County is reversed and the cause is remanded to that court for a new trial.

*Reversed and remanded.*